# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| **LARRY GORDON**<br>C/O 1825 K Street, NW, Suite 750<br>Washington, DC 20006<br><br>    Plaintiff,<br><br>        v.<br><br>**ENGILITY CORPORATION IN STATE OF MASSACHUSETTS**,<br>12010 Sunset Hills Rd.<br>Reston, VA, 20190<br><br>    SERVE:<br><br>**C T CORPORATION SYSTEM**<br>4701 Cox Rd Ste 285<br>Glen Allen, VA, 23060<br><br>    Defendant. | Case No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Larry Gordon, by undersigned counsel, and complains of Defendant Engility Corporation as follows:

## PRELIMINARY STATEMENT

1. Engility Corporation in State of Massachusetts ("Engility") constructively discharged based on false accusations that he had taken a coworker's notebook without giving Mr. Gordon the opportunity to even explain that the accusation was false because he is African American and black.

2. Then, after Mr. Gordon filed a charge of discrimination with the EEOC, Engility discriminated against Mr. Gordon because of his race and color and retaliated against him by falsely telling

a security clearance investigator and a prospective employer that Mr. Gordon had been fired and was suing the company, which contrasted with the truthful information Mr. Gordon himself had provided.

3. Mr. Gordon brings this action to recover the damages he suffered as a result of Engility's violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction over this action pursuant to Title VII.

5. Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because Engility committed the unlawful employment practice in Virginia in this judicial district.

## PARTIES

6. Mr. Gordon is a former employee of Engility.

7. Engility is an employer within the meaning of the Title VII.

8. Upon information and belief, Engility employed more than 500 employees throughout the relevant period.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Plaintiff exhausted his administrative remedies by timely filing a charge of discrimination with the EEOC on August 1, 2016.

10. Plaintiff then timely amended his EEOC charge on October 29, 2018.

11. This lawsuit has been timely filed within 90-days of Plaintiff's receipt of the EEOC's notice of right to sue, which is dated August 14, 2020.

## FACTS

*Background*

12. Mr. Gordon was employed by Total Administrative Services Corporation, Inc. ("TASC") from 2006 to 2013 as an engineer.

13. TASC is a contractor with the Federal Government and was acquired by Engility Corporation in February 2015.

14. During Mr. Gordon's first period of employment with TASC, he was an excellent employee.

15. Mr. Gordon received numerous monetary awards for exemplary customer service.

16. Mr. Gordon also earned the distinguished "Vanguard Award" for engineering excellence and innovation, the company's highest internal award available.

17. When TASC's contract with the government that Mr. Gordon was assigned to ended in 2013, he was laid off.

18. TASC specifically asked Mr. Gordon to return in mid-2014 due to the high quality of his work and applicable skills and experience.

*TASC began to replace black engineers with white engineers*

19. Several months after his return to TASC in 2014, Mr. Gordon noticed that many of the black, African American engineers were being fired and replaced with white engineers.

20. The fired engineers were told that the "customer was unhappy" with their work.

21. This explanation appeared false because highly competent engineers, who were black, African Americans, were fired and replaced with less-skilled, less-experienced white engineers.

22. The claim that "customer unhappiness" was causing the terminations of black employees also appeared false to Mr. Gordon because he had a very good personal relationship with the Branch Chief of the government customer and he did not indicate the government was dissatisfied with so many contract engineers that they would complain to TASC/Engility and request that those engineers be removed from their contract.

23. In February 2015, Engility acquired TASC and became Plaintiff's and his coworkers' employer.

*Events leading up to Mr. Gordon's constructive discharge*

24. In early fall of 2015, one of Mr. Gordon's coworkers sent an email to their entire team stating that he had lost a "notebook."

25. Mr. Gordon responded that he would keep an eye out for it.

26. Weeks passed and Mr. Gordon never heard anything more about the notebook.

27. On December 14, 2015, Mr. Gordon's manager, John Risko, a white male, called Mr. Gordon to return from the client site and report to the main government client building.

28. Mr. Risko told Mr. Gordon that someone had reported to him that Mr. Gordon had the lost notebook in his cubicle overhead.

29. A cubicle overhead is a lockable cabinet in which people often store personal items.

30. Even though Mr. Gordon usually kept his overhead locked, it was well-known among his coworkers that he kept the key in the top drawer of his desk.

31. Mr. Gordon is seldom at his cubicle desk in the main government client building because he is usually out at the client site.

32. Therefore, Mr. Gordon told his coworkers the location of his overhead key in order to ensure that, if needed, people had access to the cabinets while he was away from the office on the client site.

33. On December 14, 2015, after Mr. Gordon had returned from the client site, Mr. Risko forced him to open his cubicle overhead and upon doing so, reached over him and pulled out a textbook.

34. Mr. Risko said that it was the missing notebook and accused Mr. Gordon of stealing it.

35. Mr. Risko did not give Mr. Gordon, a long-time employee, the benefit of the doubt or even the opportunity to explain his side of the story.

36. Instead, after Mr. Risko accused Mr. Gordon of theft, he said, "[t]his is a matter of integrity," and, "[p]eople like you are liars. You're going to lie."

37. Mr. Gordon understood this, in the context of being wrongfully accused of stealing, to mean that black people are liars and thieves.

38. Mr. Risko also said that "you people will take anything," and that "black people will lie about anything."

39. Mr. Gordon's first line supervisor, Rosa Singletary, then scheduled a meeting with him for the next day.

40. Mr. Gordon took paid time off for the rest of the day because he was humiliated by Mr. Risko's baseless and false accusation.

41. When Mr. Gordon arrived home, his wife informed him that Mr. Risko had called and told her that he that Mr. Gordon had been removed from the contract because the customer did not want him any longer.

42. Mr. Risko followed up with a voicemail on Mr. Gordon's cell phone informing him of his removal from the contract and "not to return to the customer site."

43. The next day, Mr. Gordon contacted Ms. Singletary by phone and was informed again of his removal from the contract.

44. Ms. Singletary transferred the call to Mr. Risko who claimed that the customer had had it with Mr. Gordon and claimed Mr. Gordon had been removed from the contract due to "ongoing issues" with the client.

45. Due to Mr. Gordon's close and cordial relationship with the client Branch Chief, he knew this could not be the actual reason.

46. On December 15, 2015, Mr. Gordon met with Engility Human Resources to explain what happened the prior day.

47. After hearing Mr. Gordon's explanation, HR postponed a meeting that was scheduled with Mr. Risko and Ms. Singletary.

48. Without a contract to work on, Mr. Gordon had to take paid time off until January 4, 2016.

49. That day, Ms. Singletary informed Mr. Gordon that he was being placed on Leave Without Pay status and told him that he had 30 days to locate another position within Engility or he would be terminated.

50. Ms. Singletary's email encouraged Mr. Gordon to work with Mr. Risko, who would assist in connecting him with other program managers for possible position placement.

51. Given Mr. Risko's involvement in unjustifiably terminating Mr. Gordon from his contract in the first place, Mr. Gordon believed this was a futile endeavor.

52. Because of the discrimination he had experienced and Engility's obviously disingenuous attempt to allow him to find a new position, Mr. Gordon believed he had no choice but to resign rather than have a termination on his record, which would adversely affect his security clearance and ability to find replacement employment.

53. Mr. Gordon thus resigned effective February 4, 2016.

*Rosa Singletary discriminated and retaliated against Mr. Gordon after he filed a charge of discrimination with the EEOC*

54. On August 1, 2016, Mr. Gordon filed a charge of discrimination with the EEOC, which was cross-filed with the Fairfax Office of Human Rights.

55. On December 18, 2018, Mr. Gordon received notice that Engility had provided a position statement concerning his charge of discrimination, which included an affidavit from Rosa Singletary.

56. The next month, in January 2018, a security clearance investigator conducting a reinvestigation of Mr. Gordon's security clearance informed him that Ms. Singletary had told him that Mr. Gordon had been terminated from and was suing Engility.

57. Both statements were false.

58. In June 2018, a prospective employer informed Mr. Gordon that it would not hire him because Ms. Singletary had informed it that Mr. Gordon had been fired from Engility and that he was suing Engility.

59. Upon information and belief, Ms. Singletary made these false statements because of Mr. Gordon's race, color, and in retaliation for his filing an EEOC charge.

## DEMAND FOR JURY TRIAL

60. Plaintiff respectfully demands a jury trial on all Counts.

## COUNT 1

*Race discrimination in violation of Title VII*

61. Plaintiff repeats and realleges each allegation of the complaint, as if fully set forth herein.

62. Defendant subjected Plaintiff to adverse employment actions because of Plaintiff's race in violation of Title VII.

63. Defendant acted intentionally, recklessly, and/or with malice.

64. As a result, Plaintiff has sustained damages including lost wages, mental anguish, emotional distress, and pain and suffering. Plaintiff's damages are continuing.

65. By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, and compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the economic loss, physical and psychological injury, humiliation, embarrassment, and mental and emotional distress, prejudgment interest, attorneys' fees, expenses, costs, and costs of the action.

## COUNT 2

*Color discrimination in violation of Title VII*

66. Plaintiff repeats and realleges each allegation of the complaint, as if fully set forth herein.

67. Defendant subjected Plaintiff to adverse employment actions because of Plaintiff's color in violation of Title VII.

68. Defendant acted intentionally, recklessly, and/or with malice.

69. As a result, Plaintiff has sustained damages including lost wages, mental anguish, emotional distress, and pain and suffering.  Plaintiff's damages are continuing.

70. By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, and compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the economic loss, physical and psychological injury, humiliation, embarrassment, and mental and emotional distress, prejudgment interest, attorneys' fees, expenses, costs, and costs of the action.

## COUNT 3

*Retaliation in violation of Title VII*

71. Plaintiff repeats and realleges each allegation of the complaint, as if fully set forth herein.

72. Defendant subjected Plaintiff to adverse employment actions because Plaintiff opposed discrimination and/or participated in the EEOC process.

73. By and through its conduct, Defendant violated Title VII.

74. As a result, Plaintiff suffered damages, including but not limited to lost wages, salary, benefits, and other compensation; mental anguish, emotional distress, and pain and suffering.

75. By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, and compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiff for the economic loss, physical and psychological injury, humiliation, embarrassment, and mental and emotional distress, prejudgment interest, attorneys' fees, expenses, costs, and costs of the action.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant on all Counts, and award Plaintiff damages consisting of lost wages and benefits; compensatory damages for emotional distress, mental anguish, and pain and suffering; punitive damages; an amount equal to the tax on any award; costs; attorney's fees; and any such other relief as the Court deems just and proper.

Respectfully submitted,

Alan Lescht & Associates, P.C.

By: */s/Jack Jarrett*
Jack Jarrett
(VSB# 86176)
1825 K St., NW, Ste. 750
Washington, DC 20006

>T: 202.463.6036
>F: 202.463.6067
>jack.jarrett@leschtlaw.com
>*Attorney for Plaintiff*