**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| LARRY GORDON,         ) | |
|          ) | |
| *Plaintiff*,        ) | |
|          ) | **Case No. 1:20-cv-01380** |
|          ) | |
|          ) | |
| ENGILITY CORPORATION IN STATE  ) | |
| OF MASSACHUSETTS,        ) | |
|          ) | |
| *Defendant*.        ) | |
| _____) | |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Engility Services, LLC, improperly pled as "Engility Corporation In State of Massachusetts" (hereinafter referred to as "Defendant" or "Engility"), by counsel, hereby submits this Memorandum in Support of its Motion for Summary Judgment.

## I.    INTRODUCTION

Plaintiff Larry Gordon ("Plaintiff" or "Gordon") is a former employee of Engility, who through his poor performance as an engineer and ongoing interpersonal conflicts with co-workers, was removed from his assigned project, Darkhorse, by Engility's customer on December 14, 2015. Rather than find a new contract to support within Engility, Plaintiff voluntarily resigned his employment effective February 4, 2016. Now, Plaintiff attempts to inject racial discrimination into an employment situation where none exists. Plaintiff's claims fail as a matter of law because of his failure to plead or identify a comparator for Title VII analysis, no cognizable adverse employment action, and his failure to exhaust administrative remedies regarding his claim for retaliation.

TASC, Inc. hired Plaintiff on or about March 13, 2006 as an engineer. Engility Corporation in the State of Massachusetts acquired TASC in 2015, and converted into Engility Services, LLC,

1

on July 5, 2019. Plaintiff's first period of employment was from March 13, 2006 until November 8, 2013, which was briefly interrupted due to a reduction in force. On or about June 30, 2014, Plaintiff was subsequently rehired to TASC, by Program Manager – John Risko (and alleged wrongdoer) as a Network Engineer 3 to support the Darkhorse program. Between March 2015 and December 2015, Mr. Risko and Plaintiff's immediate supervisor, Project Manager - Rosa Singletary, received feedback from the Darkhorse customer, that Plaintiff was exhibiting poor performance and had interpersonal conflicts with customer leads and other co-workers. Throughout 2015, Mr. Risko and Ms. Singletary verbally counseled Plaintiff, however Plaintiff's performance did not improve. Plaintiff's failure to perform his job satisfactorily lead to the customer requesting his removal from the Darkhorse program on December 14, 2015. Plaintiff remained employed with Engility and took leave from December 15, 2015 until January 4, 2016, at which time Engility placed Plaintiff on unpaid administrative leave and provided him resources to find a new program to assist.

The undisputed facts establish that Plaintiff tendered his resignation to Employee Relations Manager - Keisha Morris, effective February 4, 2016. After failing to secure a new program to assist, Engility accepted Plaintiff's resignation. Only after his voluntary resignation, did Plaintiff raise allegations of generalized discrimination against black engineers on the Darkhorse program. Plaintiff's self-serving, unsubstantiated allegations against Mr. Risko are insufficient to establish direct evidence of discrimination and Plaintiff cannot establish a *prima facie* case of race or color discrimination because he cannot and has not alleged a comparator, was not satisfactorily performing his job, and suffered no adverse employment action. Consequently, Plaintiff's claim of race and color discrimination under Title VII fail.

Plaintiff's Title VII retaliation claim fares no better. Plaintiff's claim for retaliation must be dismissed because, among other reasons, he failed to exhaust his administrative remedies with respect to this claim and there is no temporal proximity to the protected activity and the alleged

adverse action. Furthermore, there is no evidence that Plaintiff's security clearance flag was the result of anything Ms. Singletary said to the investigator. In short, there is no triable issue of fact for a jury. For the reasons stated below, summary judgment should be awarded to Engility and respectfully, this case should be dismissed as a matter of law.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

*Engility*

1.   Engility is a provider of a wide range of services to the United States Government and to commercial customers. Engility's core businesses are considered critical support services to the U.S. Department of Defense, Federal civilian agencies and allied foreign governments. *See* Decl. of John Risko, attached as **Exhibit 1**, at ¶ 4.

2.   Engility Corporation, located in the State of Massachusetts acquired TASC in 2015, and converted into Engility Services, LLC, on July 5, 2019. *See* Ans. to Compl. ECF. No 9, attached as **Exhibit 2**, at ¶ 12.

3.   John Risko is an employee with Engility. He holds the role of Program Manager for the last seven years. Ex. 1. at ¶ 2.

4.   Rosa Singletary is an African-American woman and was employed with TASC, and subsequently Engility, for 16 years and is currently an employee of Science Applications International Corp. ("SAIC"). *See* Dep. Tr. Of Larry Gordon ("Gordon Dep."), attached as **Exhibit 3**, at 59:13-19; *See* also Decl. of Rosa Singletary, attached as **Exhibit 4**, at ¶¶ 1-4.

5.   Upon hire, all employees – including Plaintiff – are issued a copy of a company Employee Manual and Code of Ethics and Business Conduct ("Employee Manual"). The Employee Manual contains relevant equal employment opportunity and anti-discrimination policies and invited employees to contact a hotline to report any workplace issues, including discrimination, at any time. *See* Gordon Dep. at 53:7-58:3; *See* TASC Equal Employment Opportunity Policy ENGILITY000294; 296-297, attached hereto as **Exhibit 5.**

6.    On July 7, 2014, Plaintiff signed an Employee Manual Receipt and Employee At-Will Acknowledgment. *See* Employee Manual Receipt and Employee At-Will Acknowledgment, ENGILITY000118, attached hereto as **Exhibit 6**.

*Plaintiff's Employment History*

7.    Plaintiff was hired by TASC on or about March 13, 2006 and was an employee of TASC until November 8, 2013. Plaintiff's employment was terminated with TASC due to a reduction in force on November 8, 2013. Ex. 2, at ¶ 6; Gordon Dep. Ex. 3 at 49:16-20.

8.    On or about June 30, 2014, Plaintiff was rehired to TASC, by John Risko, as a Network Engineer 3 to support the Darkhorse project. Ex. 1 at ¶ 5; *See* Offer Form ENGILITY000105-000106, attached hereto as **Exhibit 7.**

9.    The Darkhorse project supported the United States Government ("customer") as its customer. Plaintiff worked as an Engineer 3 supporting the customer. As an Engineer 3, Plaintiff held two roles. The first was as a Systems Engineer in direct support of a customer representative, or manager. The second was as a lab manager. Plaintiff reported directly to Ms. Singletary, as his first line supervisor. Ms. Singletary reported to Mr. Risko, the Program Manager and was Plaintiff's second line supervisor. Ex. 1 at ¶ 5.

10.    On or about March 27, 2015, Plaintiff and a subcontractor assigned to Darkhorse, Mike Mydlow, were involved in an altercation. Plaintiff was verbally counseled by Ms. Singletary regarding his interpersonal skills with colleagues. Mr. Mydlow was not an employee of Engility. Ex. 1 at ¶ 7, Ex. 4 at ¶ 10.

11.    On April 2, 2015, Mr. Risko met with the customer and spoke about Plaintiff's technical performance. The customer felt Plaintiff was having difficulty digging in on technologies, and that he was getting terminology mixed up. On April 9, 2015, Mr. Risko was informed by the customer that Plaintiff met with the customer to discuss the challenges he was having on the Darkhorse project. Ex. 1 at ¶ 8.

4

12. On May 22, 2015, Mr. Glenn Baumgartner (the customer) came to see Mr. Risko and shared that he felt that Plaintiff was being asked to do things that he was not equipped to do in the lab. Mr. Baumgartner noted that Plaintiff did not have a lab background. Specifically, Plaintiff did not know how to properly set up equipment that cost around $300,000.00. This was a serious matter because Plaintiff could have damaged the equipment by having it wired incorrectly. Mr. Risko learned that Mr. Baumgartner told Plaintiff to stop the test, but Plaintiff declined and told Mr. Baumgartner that he knew what he was doing. The discussion became confrontational. Ex. 1 at ¶ 9.

13. On May 29, 2015, Mr. Risko met with the customer to discuss Plaintiff's performance. The customer shared that Plaintiff was not being proactive in learning how to support a particular system. The customer shared that he had to ask Plaintiff to configure and test a system, when Plaintiff should have proactively known what needed to be done. The customer also shared that Plaintiff was having interpersonal issues with others on the project. Ex. 1 at ¶ 12.

14. Mr. Risko met with the customer on June 22, 2015. The customer shared that while Plaintiff was methodical in his approach to documentation, he did not have the needed lab skills. Ex. 1 at ¶ 13.

15. On about November 6, 2015, Mr. Risko learned that Plaintiff was not engaged in a training class and displaying a negative attitude and that the customer almost removed Plaintiff from the training. Ex. 1 at ¶ 14.

16. On or about December 7, 2015, Mr. Risko was told by a subcontractor assisting Darkhorse, that he was missing an engineering textbook and that it was last seen on Plaintiff's desk. On or about December 10, 2015, Mr. Risko and Ms. Singletary found the textbook in the locked overhead bin of Plaintiff's desk. On December 14, 2015, Mr. Risko requested that Plaintiff come to the office to discuss the location of the textbook. Mr. Risko and Ms. Singletary questioned Plaintiff about why the textbook was found in his bin. Plaintiff denied taking the textbook. Plaintiff

did not accuse anyone of planting the textbook in his desk. Gordon Dep. Ex. 3 at 86:10-16. The textbook was returned to its owner and no further action was taken by Engility. Ex. 1 at ¶¶ 15-16; Ex. 4 at ¶¶ 11-14.

17.     On December 14, 2015, in light of Plaintiff's ineffectiveness and interpersonal conflicts on the government contract, the customer requested that Plaintiff be removed from the Darkhorse project. Plaintiff was not performing his job satisfactorily. As Program Manager, Mr. Risko informed Plaintiff of his removal from the contract. Plaintiff remained an employee of Engility after his removal from the contract. Ex. 1 at ¶¶ 17-19, Ex. 4 at ¶ 16 and Dep. Tr. Of Keisha Morris ("Engility Dep") at 16:7-17:7, 41:13-16, attached as **Exhibit 8**.

18.     Engility advised Plaintiff on his leave options after his removal from the Darkhorse project. Plaintiff could take unpaid or paid leave, depending on what option he determined was best for him. *See* Notice of Administrative Leave (Furlough), ENGILITY000161, 166, attached hereto as **Exhibit 9.**

19.     Plaintiff completed his debrief from the Darkhorse project on January 4, 2016. This was the last act required to remove Plaintiff from the project. At all times between December 14, 2015 and January 4, 2016, his security credentials remained active and assigned to the Darkhorse project. Ex. 1 at ¶ 25; Engility Dep Ex. 8 at 74:9-14.

20.     After Plaintiff's removal from the government contract, Keisha Morris, Employee Relations Manager, recommended placing Plaintiff on unpaid administrative leave for 30 days in order to apply for open positions with other program managers. This course of action was taken by Engility and consistent with its standard practices. Engility Dep Ex. 8 at 45:20-46:5.

21.     On January 4, 2016, Plaintiff was placed on unpaid administrative leave. Plaintiff submitted a voluntary resignation to Ms. Morris, effective February 4, 2016. *See* ENGILITY000123, attached hereto as **Exhibit 10**. Plaintiff was told that he had 30-days to find a

new project to support or that Engility would terminate his employment on February 4, 2016. Engility Dep Ex. 8 at 74:4-8, 75:13-76:4.

22.     During the 30-day unpaid administrative leave, Plaintiff remained an employee of Engility. Plaintiff was instructed to utilize the Engility Career Website to look for opportunities and collaborate with his Talent Director, Trina Fongyen, in order to find a contract to support. Plaintiff did not obtain a new contract to support on a program with Engility. Gordon Dep. Ex. 3 at 164:24-165:18, 170:9-21; Engility Dep Ex. 8 at 73:21-74:14.

23.     Plaintiff's voluntary resignation with Engility became effective on February 4, 2016. Engility Dep Ex. 8 at 75:13-76:4; *see* Engility000122 attached hereto as **Exhibit 11**; *see also* GORDON0004 attached hereto as **Exhibit 12**.

24.     After Plaintiff's employment with Engility was concluded, Plaintiff made a complaint of generalized discrimination against black engineers on the Darkhorse project. Ms. Morris conducted an investigation that revealed that Plaintiff's complaint was unfounded. *See* Engility Investigation Report ENGILITY000278-000279, attached hereto as **Exhibit 13**, *see also* Engility Dep Ex. 8 at 77:16-78:7**.**

25.     Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 1, 2016. Plaintiff filed an Amended Charge of Discrimination with the Fairfax County Office of Human Rights ("Administrative Agency") and Equity Programs on August 31, 2016. Plaintiff never filed a Charge of Discrimination with any agency alleging retaliation. *See* EEOC Charge of Discrimination and Amended Charge of Discrimination, attached hereto as **Exhibits 14 and 15.**

### III.     STANDARD OF REVIEW

Summary judgment should be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Holland v. Flowserve U.S., Inc.*,

7

2013 U.S. Dist. LEXIS 72015, at *3-4 (W.D. Va., May 21, 2013) (citing Fed. R. Civ. P. 56(a)). An issue is "genuine" if a reasonable jury could return a verdict for the non-moving party. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015). A fact is "material" if, based on the governing law, it could affect the outcome of the suit. *Id*. "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (internal quotation marks omitted).   If the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.  To successfully defeat a motion for summary judgment, the non-moving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." *CMA CGM S.A. v. Deckwell Sky (USA) Inc.*, 91 F. Supp. 3d 841, 845 (E.D. Va. March 17, 2015) (citation omitted). Ultimately, the trial court has an "affirmative obligation" to "prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323-24). The Fourth Circuit has held that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corp*., 736 F.2d 946, 960 (4th Cir. 1984).

## IV.    ARGUMENT

**A.     Summary Judgment Should Be Granted To Engility On Plaintiff's Claims Of Race and Color Discrimination In Violation Of Title VII**

Engility did not discriminate against Plaintiff on the basis of race or color – or for any other reason - and Plaintiff cannot make a *prima facie* case of race or color discrimination. Title VII prohibits both race and color discrimination, proof of which requires the plaintiff to establish a *prima facie* case under the *McDonnell Douglas* framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792-93 (1973). Color discrimination takes the form of discrimination based on skin color including the lightness, darkness, or other color characteristics of the individual. *Saint*

8

*Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by pointing to evidence in the record showing that: (1) plaintiff is a member of a protected class; (2) satisfactory job performance; (3) plaintiff was subjected to an adverse employment action; and (4) different treatment from a similarly situated employee outside the protected class. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010, aff'd, 132 S. Ct 1327 (2012)).

### 1.    *Plaintiff Has Not Adduced DirectEevidence of Discrimination.*

Direct evidence of discrimination is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cae. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006). To proceed under the direct method, a plaintiff must point to direct evidence of discrimination that, if believed by the trier of fact, proves discriminatory conduct by the employer without resorting to inference or presumption. *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1354 (2015); *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 446 (4th Cir. 2013). Plaintiff's own allegations demonstrate the need for inference and presumption. Pl. Compl. ECF No. 1 at ¶ 37. ("Mr. Gordon **understood this**, in the context of being wrongfully accused of stealing, **to mean** that black people are liars and thieves.") (emphasis added). Plaintiff's transparent attempt to include allegations in his Complaint, not present in his Charge of Discrimination, cannot bypass his burden to establish a *prima facie* case of race or color discrimination.

Plaintiff's Charge of Discrimination elicits no facts to permit an analysis of this case under a direct evidence method. The findings from the Administrative Agency, that define the scope of the charge, explicitly state that there was no direct evidence in the case. *See* County of Fairfax,

9

Virginia Final Investigative Report, attached hereto as. **Exhibit 16** at pg. 9 ("Where, as here, there is no direct evidence of prohibited discrimination…."). Plaintiff's claim necessitates the need to identify a similarly situated comparator. *See Coleman*, F.3d 187, 190. Plaintiff filed an Amended Charge, identifying a person Plaintiff claimed performed similarly to him but was not subject to the same or similar treatment. *See* Ex. 15. Only after a finding by the Administrative Agency that Plaintiff failed to identify a similarly situated individual, does Plaintiff now, for the first time, attempt to inject statements of purported direct evidence of discrimination into his case. *See generally* Ex. 15; *see also* Pl. Comp. ECF 1 at ¶ 38.

In Paragraph 38 of his Complaint, Plaintiff alleges that Mr. Risko stated, "you people will take anything" and that "*black people* will lie about anything." (emphasis added). This allegation does not appear in his Charge of Discrimination, the Amended Charge of Discrimination, or any other document. Plaintiff cannot now change the basis of his claim through this addition in his Complaint because this constitutes a failure to exhaust administrative remedies. "[A] plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and **discriminatory conduct** than the central factual allegations in his formal suit." (emphasis added). *Chacko v. Patuxent Inst*., 429 F.3d 505, 506 (4th Cir. 2005). There is no other source or witness to corroborate these alleged comments. In fact, Plaintiff did not even ascribe these comments to Mr. Risko during his own deposition.

> Q:      Those were his words, you said those were his words "to an effect." What did he actually say?
> A:      I don't know the exact words, I mean it's impossible for me to know his exact words. He said something to the effect that, "You people." I do remember "You people," "will take anything and will lie about it."

Gordon Dep. at 81:22-82:4. The non-moving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." *CMA CGM S.A. v. Deckwell Sky (USA) Inc.*, 91 F. Supp. 3d 841, 845 (E.D. Va. March 17, 2015).

Finally, even if the statements could be considered and were true – which Engility and Mr. Risko vehemently deny – this statement could not establish direct evidence of discriminatory intent because as described *infra*, there is no adverse employment action in this case. Proximity between the evidence of discriminatory intent and the allegedly adverse employment actions must be "very close" to establish causation. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Finally, as described in the following section, Plaintiff must overcome the "same actor" inference that provides that Mr. Risko does not have race or color animus against him.

2.   ***The "Same Actor" Inference Presumes That Mr. Risko Did Not Have Race Or Color Animus Towards Plaintiff And Plaintiff Has Failed To Overcome That Presumption.***

The Fourth Circuit recognizes a "same actor" inference that presumes that an employer's stated reason for acting against an employee is not pretextual when the employee was hired and fired by the same person within a relatively short time span. *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir.1991).

It is undisputed that Mr. Risko interviewed and hired Plaintiff as an Engineer 3 for the Darkhorse program on or about June 30, 2014. (*See supra* SUMF at ¶ 8 )[1]. Mr. Risko was Plaintiff's second line supervisor from June 30, 2014 until the customer removed Plaintiff from the Darkhorse program. SUMF at ¶ 8-9. Indeed, Plaintiff admits his relationship with Mr. Risko was "professional." Gordon Dep. 59:13-22. When the person who hired the plaintiff is the same person

---

[1] "SUMF" refers to the Statement of Undisputed Materials Facts and the corresponding exhibits cited in § II of this brief.

who supervised and took adverse action against the employee, the conclusion that the decision maker was motivated by discriminatory animus is not logical. *Proud*, at 797. ("[I]t hardly makes sense to hire workers from a group one dislikes thereby incurring the psychological costs of associating with them only to fire them once they are on the job.")

In cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." 945 F.2d at 797. *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir.1998); *see, e.g., McDonald v. Loudoun Cnty. Bd. of Supervisors*, No. 1:10cv449, 2011 WL 3951621, at *4 (E.D.Va. Sept. 6.2011) ("There is a strong presumption that [defendant] would not hire somebody in [p]laintiff's protected class only to discriminate against him at a later date").

This legal presumption is even stronger here because Mr. Risko did not terminate Plaintiff, but rather, merely carried out the wishes of the customer by removing Plaintiff from the Darkhorse program. Plaintiff then subsequently voluntarily resigned his employment from Engility. Indeed, it defies logic to conclude that Mr. Risko would think highly enough of Plaintiff in 2014 to hire him, only to develop animus and discriminate against Plaintiff in 2015, for the same characteristics Plaintiff had when Mr. Risko hired him.

Additionally, Ms. Singletary, who played a major role in counseling Plaintiff throughout 2015, and was present on December 14, 2015 when Plaintiff was asked about Mr. Knott's missing textbook, is African-American. Ms. Singletary's race is relevant in this case because an allegation of discrimination loses persuasiveness when a key player in the disciplinary process falls within the same protected class as the plaintiff. *See Coggins v. Gov't of D.C.*, No. 97cv2263, 1999 U.S. App. LEXIS 2603, at *11 (4th Cir. Feb. 19, 1999) (unpublished) ("The fact that both Krull and

Gibbons, first and third in Coggins' chain-of-command, are both Caucasian makes any anti-Caucasian bias unlikely."); *Elrod v. Sears, Roebuck Co*., 939 F.2d 1466, 1471 (11th Cir. 1991) ("[I]t is difficult for a plaintiff to establish discrimination when the allegedly discriminatory decision-makers are within the same protected class as the plaintiff.").

### 3. *Plaintiff Cannot Establish A Prima Facie Case Of Discrimination Under Title VII.*

#### a. *Plaintiff Cannot Show That He Was Treated Differently Than Similarly Situated Employees Outside Of His Protected Class.*

Plaintiff must establish that he suffered an adverse employment action, while similarly situated employees outside of his protected class were retained under the same or similar circumstances, to support his *prima facie* case. *Bryant v. Bell Atlantic Maryland, Inc*., 288 F.3d 124, 134-135 (4th Cir. 2002). Here, no evidence exists to support this element of his claim, and Plaintiff has not even attempted to establish this essential element of his claim. Plaintiff's Complaint does not even allege a comparator. As further discussed *infra*, the uncontested evidence establishes that Engility handled Plaintiff's removal from the contract and his resignation, in the same manner it would have handled any other employee similarly situated to Plaintiff. Engility Dep. 42:6-43:3. Plaintiff cannot show that other employees who were exhibiting poor performance and interpersonal conflicts with co-workers, who were requested to be removed by the customer and voluntarily resigned their employment, were treated differently than he. This alone is fatal to Plaintiff's case and Plaintiff's Title VII race and color discrimination claims must be dismissed on this grounds.

#### b. *No Evidence That Black Engineers Were Being Terminated By Engility.*

Being a complete fabrication, Plaintiff has no evidence by which a rational jury could find that race or color played a role in TASC or Engility replacing black engineers with white engineers.

13

While making this allegation in his complaint, Plaintiff cannot substantiate any of these allegations with relevant or admissible evidence. This fabrication is based only on Plaintiff's own perception and speculation. Gordon Dep. 76:22-77:14. Indeed, Engility still investigated Plaintiff's claim and determined it was unfounded. *See* SUMF 24. The non-moving party "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, the mere existence of a scintilla of evidence, or the appearance of some metaphysical doubt concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F.Supp.2d 696, 704 (E.D. Va. 2006).

### c.    *Plaintiff Was Not Performing His Job Satisfactorily.*

Plaintiff has failed to establish satisfactory performance of the position. In determining whether a plaintiff is qualified for a position, the court considers whether the plaintiff was satisfactorily performing the job. *Conyers v. Va. Hous. Dev. Auth.*, 927 F. Supp. 2d 285, 292 (E.D. Va. 2013). A plaintiff's own opinion or co-worker opinions about the plaintiff's qualifications do not create a genuine dispute of material fact. *Mungro v. Giant Food, Inc.*, 187 F. Supp. 2d 518, 522 (D. Md. 2002). Plaintiff's self-serving testimony regarding his own job performance "cannot [demonstrate] a genuine issue as to whether [the plaintiff] was meeting [the employer's] expectations." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff.") (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)). During Plaintiff's time as an Engineer 3 on the Darkhorse program, Plaintiff exhibited poor performance and had interpersonal conflicts with government leads and other co-workers. *See* SUMF ¶¶ 10-17. Plaintiff was verbally counseled by Mr. Risko and Ms. Singletary about his interactions with the customer and his co-workers. *See* SUMF ¶¶ 10,

14

16. During Plaintiff's time on the contract, he held two roles as an Engineer 3. The first was as a Systems Engineer in direct support of a government representative. The second was as a lab manager. *See* SUMF ¶ 9. Plaintiff's ongoing interpersonal conflicts with the customer made his support as a Systems Engineer ineffective. Plaintiff was removed from his role as a lab manager after receiving customer feedback that Plaintiff did not have the lab skills needed to meet the requirements of the lab management position. *See* SUMF ¶¶ 11, 13-14 . In light of Plaintiff's ineffectiveness and interpersonal conflicts on the government contract, the customer requested that Plaintiff be removed from the contract on December 14, 2015. *See* SUMF¶ 17. Plaintiff's own self-assessment of his work performance is immaterial to the analysis of this element and Plaintiff cannot satisfy this essential element of his *prima facie* case and therefore his Title VII race and color discrimination claims must be dismissed.

#### d.   *Engility Took No Adverse Action Against Plaintiff.*

A discrimination claim under Title VII necessarily requires Engility to have taken some adverse employment action against Plaintiff in order to have a claim as a matter of law. An adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). Plaintiff has not met his burden of showing that he suffered an adverse employment action because Plaintiff was removed from the Darkhorse program by the customer (not Engility) and voluntarily resigned his employment on February 4, 2016. Regardless of how a plaintiff pursues a discrimination claim under Title VII, the absence of any adverse employment action is fatal to a plaintiff's claim. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).

First, it is uncontroverted that the U.S. Government customer requested Plaintiff's removal from the Darkhorse project. *See* SUMF ¶ 17. Therefore, Engility did not take this adverse employment action against Plaintiff. Second, Plaintiff's removal from the Darkhorse project on December 14, 2015, does not constitute an adverse employment action because it did not constitute a significant change in his employment status. Plaintiff remained employed by Engility. *See* SUMF ¶¶ 17-23. Plaintiff did not have a program to support, therefore it was his option whether to take paid time off or unpaid administrative leave. Engility advised Plaintiff of his options and to make the decision that was best for him. *See* SUMF ¶¶ 18-23. On January 4, 2016, Plaintiff conducted his debrief of the Darkhorse project and was officially removed from the project. *See* SUMF ¶ 19. Without a project to support, Plaintiff was placed on unpaid administrative leave, in order to identify a new project to assist. *See* SUMF ¶ 22. Rather than utilize the resources provided to him by Engility to find a new project to support, Plaintiff voluntarily resigned effective February 4, 2016. *See* SUMF ¶ 23.

Plaintiff's February 4, 2016 voluntary resignation also cannot constitute an adverse employment action. It is axiomatic that a voluntary resignation cannot constitute an adverse employment action. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 186 (4th Cir. 2004); *see also Cooper v. Smithfield Packing Co., Inc.*, 724 F. App'x 197, 202 (4th Cir. 2018) ("[V]oluntary resignation is not an adverse employment action."). It is not in dispute that Plaintiff tendered his resignation to Ms. Morris on January 4, 2016, effective February 4, 2016. *See*  Ex. 10 and Plaintiff's attorney letters GORDON00072-73, 00024-00025, 00069, attached hereto as **Exhibits 17, 18, and 19.**  Plaintiff's resignation letter was submitted consistent with Engility's policy on voluntary resignations. *See* TASC Voluntary Separations/Resignations  ENGILITY000303, attached hereto as **Exhibit 20.** Plaintiff unambiguously notified Engility that he was resigning and

16

wished Engility further success. *See*. Ex. 10 ("I appreciate the experience obtained over the many years and wish the company further success in the future."). In subsequent communications from Plaintiff's counsel, Plaintiff's actions are consistently referred to as a voluntary resignation. Plaintiff admits in his own deposition testimony it was a voluntary resignation. Gordon Dep. 178:12-15.

Faced with the irrefutable principle of law that a resignation is not an adverse employment action, Plaintiff has now concocted a baseless theory in an attempt to salvage his claims and create the requisite adverse employment action by claiming constructive discharge. Pl. Compl ECF No. 1 at ¶¶ 1, 52. When an employee resigns in the face of "working conditions [that have] become so intolerable that a reasonable person in the employee's position would have felt compelled to resign[,]" Title VII may treat the  resignation as tantamount to a discharge for purposes of the "adverse employment action" element. *Pa. State Police v. Suders*, 542 U.S. 129, 141-43 (2004). But "when an employee voluntarily quits under circumstances insufficient to amount to a constructive discharge, there has been no adverse employment action." *Hartsell v. Duplex Products, Inc*., 123 F.3d 766, 775 (4th Cir. 1997).

In order to establish a constructive discharge, a plaintiff must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign. *Suders*, at 153; *James*, *368* F.3d 371, 378; *Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir. 1993). When a plaintiff alleges that his discharge was constructive rather than overt, the plaintiff must prove that the employer deliberately made the employee's working conditions "intolerable in an effort to induce [the employee] to quit." *Taylor v. Va. Union Univ*., 193 F.3d 219, 237 (4th Cir. 1999). "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the plaintiff to quit." *Id*.

17

Constructive discharge requires more than just harassment, discrimination, or humiliation and, indeed, **requires a greater degree of harassment than a hostile work environment claim**. *Taylor* at 237. (emphasis added). When the complained-of issue "is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id*. "[D]ifficult or unpleasant" or "[e]ven truly awful working conditions" may be insufficient to satisfy the intolerability requirement. *Hill v. Verizon Maryland, Inc*., No. 07-cv-3123, 2009 WL 2060088, at *12-13 (D. Md. July 13, 2009).

### i. Plaintiff has not demonstrated reasonable intolerability based on race or color such that a reasonable person would resign.

Plaintiff fails to state a claim for constructive discharge under Title VII for at least two reasons. First, he pleads no facts indicating that Mr. Risko took any actions with the intent to force him to quit. Indeed, Plaintiff alleges no facts that even imply Mr. Risko wanted him to resign. Plaintiff merely states that "Because of the discrimination he had experienced and Engility's obviously disingenuous attempt to allow him to find a new position, Mr. Gordon believed he had no choice but to resign rather than have a termination on his record, which would adversely affect his security clearance and ability to find replacement employment." (Pl. Compl. ¶ 52.) *See Nash v. Braswell Foods, Civil Action* No. 3:16cv592, 2017 U.S. Dist. LEXIS 28443, at *13 (E.D. Va. Feb. 28, 2017) (holding that failing to plead deliberateness by the employer insufficient to allege a *prima facie* case.).

Second, Plaintiff pleads no facts that would lead a reasonable person to find his working conditions intolerable. To determine whether there was an objectively intolerable environment, "[c]ourts determine 'whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Jordan v. Alternative Resources Corp*., 458

F.3d 339 (4th Cir. 2006). For instance, in *Martin v. Merck & Co., Inc.*, No. 5:05CV00028, 2006 U.S. Dist. LEXIS 60830 (W.D. Va. 2006), three black employees at Merck's pharmaceutical plant alleged 38 incidents of racial harassment. In determining whether the plaintiffs had demonstrated sufficiently severe and pervasive conduct, the court considered numerous incidents of racially derogatory comments (or events), including, but not limited to:  (1) statements during a company meeting that there never had been, and never would be, a black female supervisor, *Id*. at *6; (2) numerous instances where the word "n_____" was used in front of the plaintiffs, *Id*. at *6, *11; (3) an Energizer Bunny toy that was defaced to read "n_____" rather than "Energizer," *Id*. at *7-8; (4) an incident in which a Hispanic employee was taunted with a noose, *Id*. at *8; (5) an instance in which a white employee told a black employee that he needed to go back to the jungle, *Id*.; and (6) an incident where white employees taunted one of the plaintiffs in the locker room saying that she had an unpleasant odor because she was a black woman and also making fun of her hair, weight, and appearance.  *Id*. at *9.  The court concluded that "while these incidents may be evidence of an unpleasant working environment, they do not permeate Merck 'with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Martin*, at * 36 (quoting *Oncale*, 523 U.S. at 78).

In the instant case, we have only Plaintiff's interpretation that Mr. Risko's alleged comments, "You people will take anything and will lie about it" is racially motivated. Pl. Compl. ECF No. 1 at ¶ 37. ("Mr. Gordon understood this, in the context of being wrongfully accused of stealing, to mean that black people are liars and thieves."). Plaintiff has failed to produce any evidence, aside from his own bald assertions that these alleged comments were ever made. However, even if true – including the allegations of race raised for the first time in the Complaint

- there is no allegation of any comments approaching those found in *Martin*. In short, the alleged single isolated incident in this case falls short of satisfying the objective intolerability requirement for an actionable hostile work environment claim, let alone a constructive discharge claim.

### ii. Plaintiff has not shown that his conditions of employment were subjectively altered.

Plaintiff also cannot demonstrate that the alleged discrimination subjectively altered the terms and conditions of his employment such that subjectively he felt compelled to resign. To the contrary, Plaintiff testified expressly (1) that he considered himself to be an excellent employee; (2) that he was able to go to work each day focused on doing a good job; and (3) and that he wanted to continue working for Engility. Gordon Dep. at 179:17-180:18.  Under the law, "[i]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Turner v. Int'l Union Auto. Aero. and Agricultural Implement Workers of Am.,* 1998 U.S.  App. LEXIS 15342, *10 (6th Cir. 1998) (quoting *Harris,* 510 U.S. at 21)).

In *Tillery v. ATSI, Inc.,* 2003 U.S. Dist. LEXIS 7119 (N.D. Ala. 2003), the plaintiff alleged a religiously hostile environment in violation of Title VII. Applying an analysis identical to that for claims of racial harassment, the court dismissed the plaintiff's harassment claim because the alleged instances of harassment (which are not identified in the opinion) were not sufficiently severe and pervasive, from a subjective standpoint, to be actionable.  *Id.* at *32-35. In so holding, the court acknowledged that, "[o]rdinarily, the subjective component is satisfied by the plaintiff's own testimony.  Even so, . . .the mere fact that this 'burden can usually be met easily by a properly motivated plaintiff does not mean that meeting the burden is a meaningless formality or that actual evidence is unrequired.  This evidence . . . is the heart of the case.  And,

20

therefore, courts must allow no fudging on the 'proof.'" *Id.* at *32-33 (quoting *Mendonza v. Borden, Inc.,* 195 F.3d 1238, 1253-54).

The court in *Tillery* further explained that "the present case presents one of those unusual instances in which the plaintiff did not subjectively perceive her working environment to be either severely or pervasively hostile or abusive. Her deposition testimony unambiguously reveals that she did not find [her manager's] religious statements and inquiries to be so abusive that it altered the terms or conditions of her employment . . . ." *Id.* at *33. The court relied on the following deposition testimony to find that there was no alteration of the Plaintiff's conditions of employment from a subjective perspective:

> Q:    Besides your medical or personal reasons, was there anything else that kept you from doing your job effectively?
> A:    No, sir.
> Q:    And you wanted to keep your employment at ATSI?
> A:    Oh, yes, very much.
> Q;    You were able to do your job effectively?
> A:    I thought I did.
> Q:    Were the discussions you were having with [your manager], were they inhibiting your ability to do your job at all?
> A:    No.

*Id.,* at *33-34.

In the case at bar, Plaintiff's own testimony is no different from the testimony of the plaintiff in *Tillery* and demonstrates that the alleged discrimination did not interfere with his ability to perform his job or alter the terms and conditions of his employment. For instance, Plaintiff testified:

> Q:    Okay. So my question to you is did you still want to continue to work for Engility?
> A:    Yes.
> Q:    After January…
> A:    Yes. The priority was providing for my family. That's the priority.
> Q:    And you felt like you were doing a good job for Engility the entire time you were employed there, correct?
> A:    I was in fact doing a good job based on promotion, based on salary increase, as provided and indicated and stated by Engility in the citations, and also by the winning of a Vanguard Award, which is the highest engineering award you can win.

> Q:    On a scale of one to 10, if you had to rank your performance in 2015, with 10 being the best and one being the worst, how would you rank your performance?
> A:    Ten.
> Q:    Were you able to go to work every day, focus on doing your job?
> A:    Above and beyond, yes.
> Q:    And you would have continued working for Engility if you had found another position, another contract prior to February 4th, 2016?
> A:    My family takes priority, yes.

Gordon Dep. at 179:17-180:18

Finally, as discussed in greater detail below, Plaintiff's failure to report any instances of alleged harassment to Engility, also supports the reasonable inference that he did not, in fact, subjectively view such alleged discrimination as altering the terms and conditions of his employment. In short, Plaintiff has no evidence, objectively or subjectively, that the alleged conduct was sufficiently severe and pervasive to support the claim of constructive discharge as an adverse employment action. Plaintiff cannot satisfy the standard that he was subject to working conditions that were so intolerable that a reasonable person would resign. *See United States EEOC v. Consol. Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (standard for constructive discharge is "objective intolerability"). In attempting to satisfy this standard, Plaintiff's argument solely relies on a single incident of alleged statements by Mr. Risko on December 14, 2015. However, this isolated incident cannot give rise to objective intolerability, especially given Plaintiff's own subjective feelings that he wanted to continue to work for Engility. This belies Plaintiff's constructive discharge theory, and supports the reality that Plaintiff voluntarily resigned. *See* Ex. 10; *see also* Gordon Dep. 178:12-15.

    **4.**    **Plaintiff Has No Basis For Imputing Liability On Engility.**

Employers may utilize an affirmative defense to defeat a plaintiff's allegations of discrimination by showing: (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) that the plaintiff employee unreasonably failed to take

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765 (1998). "Although an employer may be subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor, when no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." [23] *Id.*

Even if Plaintiff could satisfy the first three prongs of a *prima facie* case of race and color discrimination—which he cannot because he has no comparator, was not satisfactorily performing his job and has suffered no adverse employment action—he has failed to present sufficient evidence for imputing liability to Engility, as required by the fourth prong. First, the facts demonstrate that Engility exercised reasonable care to prevent and correct promptly any harassing behavior of which it was made aware. Engility had an anti-harassment policy, which prohibits harassment and identifies numerous individuals to whom a victimized employee should complain. *See* SUMF ¶ 5. Proof that an employer has in place an effective anti-harassment policy is sufficient to meet the first element of the affirmative defense. *Pritchard v. Earthgrains Baking Co.'s, Inc.,* 1999 U.S. Dist. LEXIS 21069 (W.D. Va. 1999). Plaintiff was aware that Engility had an anti-harassment policy and, indeed, signed a form acknowledging his awareness. *See* SUMF ¶ 6.

In regards to the second prong of the affirmative defense, Plaintiff's discrimination claims fail because he unreasonably failed to take advantage of Engility's anti-harassment policy or to

---

[2] If, as in this case, an employer demonstrates that a tangible employment action was taken for nondiscriminatory reasons, such action does not vitiate the employer's affirmative defense. *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 182 (4th Cir. 1998).

[3] Although *Ellerth* dealt specifically with claims of sexual harassment, the defense applies with equal force to other types of claims under Title VII. *See Owen v. Rutherford Supply Corp.,* Civil Action No. 3:19cv225-HEH, 2020 U.S. Dist. LEXIS 95346 (E.D. Va. Jan. 23, 2020*)* (applying the affirmative defense in the context of discrimination).

23

avoid harm otherwise. Indeed, at no time during his employment did Plaintiff report discrimination against Mr. Risko to Engility. *See* SUMF ¶ 24 and Plaintiff Interrogatories, attached hereto as **Exhibit 21** at ¶ 9. However, "[i]t is plaintiff's responsibility to come forward with probative evidence concerning [] alleged complaints in order to avoid summary judgment." *Holley v. The Great Atlantic & Pacific Tea Co.,* 2006 U.S. Dist. LEXIS 4794, *21 (D. Md. 2006) (citing *Sylvia Development Corp. v. Calvert County, Md.,* 48 F.3d 810, 818 (4th Cir. 1995)).

Because Plaintiff failed to notify Engility of alleged discrimination, Engility cannot now be held liable for instances of discrimination to which it was previously unapprised. No basis in law exists for imputing such broad liability to Engility. *See, e.g., Lee v. Va. Beach Sheriff's Office*, 2014 U.S. Dist. LEXIS 51969, at *41 (E.D. Va. April 14, 2014) (no liability for harassment where employee never complained of race or gender based harassment through an internal complaint process or otherwise).

### 5. Plaintiff Cannot Prove That The Legitimate Business Reason Articulated By Engility Was A Pretext For Race Or Color Discrimination.

Even if Plaintiff could prove a *prima facie* claim of Title VII discrimination —which he cannot— the uncontroverted evidence is that Engility handled Plaintiff's removal from the Darkhorse project and his voluntarily resignation in the same manner it would have done with other employees. Engility Dep. at 42:6-43:3.

Because Engility has articulated a legitimate, non-discriminatory reason for the decision to remove Plaintiff from the Darkhorse project at the customer's request and accept Plaintiff's voluntary resignation, the burden shifts back to Plaintiff, who "must show that 'the legitimate reason offered by the defendant [was] not [its] true reason, but [was] a pretext for discrimination.'" *Love-Cotman v. Martin*, 355 F. 3d 766, 788 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 253). This is a difficult standard, which Plaintiff cannot satisfy.

24

In analyzing pretext in the context of a summary judgment motion, the Court must "proceed directly to the ultimate question of whether [Plaintiff] has met [his] burden of offering sufficient evidence upon which a reasonable jury could conclude that the reason articulated by [Engility] [was] not [the real] reason, but instead merely pretext to disguise racial discrimination." *Murray v. United Food & Commercial Workers Union Local 400*, 100 Fed. Appx. 165, 2004 U.S. App. LEXIS 11341 at *18 (4th Cir. 2004) (citing *Reeves and Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (en banc)). "To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that the protected trait…actually motivated the employer's decision." *Hill*, 354 F.3d at 286 (internal quotations omitted). The Fourth Circuit described the difficulty of proving pretext in the Murray decision as follows:

Proof that the employer's proffered reason is unpersuasive, or even obviously contrived, however, "does not necessarily establish that [the plaintiff's] proffered reason [race discrimination] . . . is correct." [citing *Reeves*, 530 U.S. at 146-47]. "It is not enough to disbelieve the defendants." *Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004). Rather, the jury must be reasonably able to "believe [the plaintiff's] explanation of intentional race discrimination." *Id.*

In the present case, the decision to remove Plaintiff from the Darkhorse project is devoid of any hint of discriminatory intent. Plaintiff was failing to meet the customer's expectations and having interpersonal conflicts with co-workers. *See* SUMF ¶¶ 10-19 . Plaintiff was then removed from the Darkhorse project at the customer's request. *See* SUMF ¶ 17. Plaintiff voluntarily resigned after failing to identify a new contract to support after the customer requested his removal from the Darkhorse project. *See* SUMF ¶¶ 21-23. After Plaintiff concluded his debrief from the Darkhorse project on January 4, 2016, Engility placed Plaintiff on unpaid administrative leave. *Id.* Rather than accepting his immediate resignation – as Engility absolutely could have done - Engility assisted Plaintiff in finding a new contract to support. *Id.. Cf. Phifer,* 5:08-CV-00292-FL,

2010 WL 3834565, at *15 (E.D.N.C. Aug. 12, 2010), report and recommendation adopted, No. 5:08-CV-292-FL, 2010 WL 3860411 (E.D.N.C. Sept. 28, 2010) ("[D]ecision to accept a resignation immediately, and waive a notice period that would have required an employee to work for an additional, limited period of time, does not constitute an adverse employment action."). Only after his scheduled 30-day administrative leave concluded on February 4, 2016, and Plaintiff had not secured a new contract to support, did Engility accept Plaintiff's resignation. Engility Dep. at 75:13-20.

In sum, Engility had a legitimate, non-discriminatory reason for all the actions Engility took with Plaintiff. Engility's decisions in this regard are therefore not only not adverse actions as a matter of law, but also examples of the application of its uniform and non-discriminatory business practices. Plaintiff has not, and cannot, show otherwise; his claims must accordingly fail.

**B.      Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation Because He Did Not Exhaust His Administrative Remedies and Cannot Show a Causal Connection Between His Protected Activity.**

Plaintiff claims that after he filed his Amended Charge of Discrimination on August 16, 2016, Ms. Singletary retaliated against him in 2018 by telling a security clearance investigator that he was "terminated" from Engility and that he was "suing." Pl. Compl. ECF No. 1 at ¶ 56. These statements allegedly led to a flag in his file that prevented him from securing employment with companies that required an unencumbered investigation. *Id*. at 58. Plaintiff's retaliation claim fails because he did not exhaust his administrative remedies on his retaliation claim and he cannot show a causal connection between the protected activity and the alleged adverse action. To establish a *prima facie* case of retaliation, Plaintiff must show (1) that he engaged in a protected activity, (2) that Engility took an adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse employment action. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

**1.** ***Plaintiff Never Made A Retaliation Claim With An Administrative Agency.***

It is well-established that a plaintiff must exhaust administrative remedies before instituting a Title VII lawsuit. *Chacko v. Patuxent Inst*., 429 F.3d 505, 509 (4th Cir. 2005). Specifically, "[i]f the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Id.* (quoting *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir.1995) (internal punctuation omitted). The Fourth Circuit has stated that allegations of certain discreet acts in an administrative charge are insufficient to allege a broader pattern of misconduct, and that claims will be barred if the charge alleges discrimination on one basis, but introduces another basis in formal litigation. *See Chacko*, 429 F.3d at 509 (4th Cir. 2005); *see also Dennis*, 55 F.3d at 153, 156–57 (charge of discrimination that alleged discrimination in defendant's disciplining did not cover broader pattern of discrimination in hiring, training, and promotion); *Taylor v. Va. Union Univ*., 193 F.3d 219, 239 (4th Cir.1999) (abrogated on unrelated grounds) (finding failure to exhaust administrative remedies where facts incorporated into the charge, including after-hours phone calls and touching, were too inconclusive to suggest sexual harassment). Furthermore, it is the EEOC charge, not the totality of the EEOC investigative file that defines the scope of Plaintiff's claims. *See Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 962-63 (4th Cit. 1996) ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint.") (emphasis added).

The exhaustion analysis is further limited to the charge of discrimination and cannot be broadened by letters and notices outside of the formal proceedings. *See Balas v. Huntington Ingalls Indus., Inc*., 711 F.3d 401 (4th Cir. 2013). In *Balas*, the Fourth Circuit considered whether the plaintiff's reference to the investigative file and two letters submitted to the EEOC could broaden

the EEOC charge beyond the allegations asserted in the amended charge. 711 F.3d at 406. The Fourth Circuit affirmed the district court findings that found such letters could not function to broaden the scope of the EEOC charge. *Id.* (quoting *Sloop v. Mem'l Mission Hosp., Inc.,* 198 F.3d 147, 149 (4th Cir.1999) ("it would be objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges with the EEOC is to put the charged party on notice of the claims raised against it.")

Here, it is undisputed that Plaintiff neither raised any allegations of retaliation in his charge of discrimination, did not check any box for retaliation, nor did the agency investigate any claims of retaliation. Exs. 14 and 15. The only mention whatsoever of retaliation is found in a belated letter from Plaintiff's attorney to the Administrative Agency. Ex. 18. However, as stated in *Balas*, this letter cannot serve to amend or broaden the scope of the charge when the charge and amended charge failed to mention any allegations of retaliation. Thus, Plaintiff's retaliation claim is barred as a matter of law. *See e.g., Tonkin v. Shadow Mgmt., Inc*., 605 F. App'x 194 (4th Cir. 2015) (affirming district court's dismissal of plaintiff's retaliation claim because EEOC charge only alleged pregnancy discrimination, not retaliation); *McLaughlin v. Barr*, No. 1:20-CV-230, 2020 WL 6875143, at *4 (M.D.N.C. Nov. 23, 2020) (finding that retaliation claim was barred because the conduct did not go through the necessary administrative process*); Ciociola v. Baltimore City Bd. of Sch. Comm'rs*, No. CCB-15-1451, 2017 WL 4280729, at *7 (D. Md. Sept. 27, 2017) ("Ciociola never checked the retaliation box on his EEOC charge form and neither did he mention his retaliation claim in his narrative.... There is not a single fact alleged ... that would hint at the existence of retaliation. A reasonable investigation of these facts would not include retaliation,

28

and, therefore, the plaintiff's retaliation claim must be dismissed for failure to exhaust his administrative remedies.")

> **2.      There Is No Causal Connection Between Plaintiff's Administrative Charge And Ms. Singletary's Alleged Comments.**

Even if Plaintiff had exhausted his administrative remedies for his retaliation claim – which he has not - to prove a causal connection at the *prima facie* stage, Plaintiff must be able to show that these acts were taken "because [he] engaged in a protected activity." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2008) (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)) (emphasis in original).

A plaintiff may establish the existence of facts that "suggest[] that the adverse action occurred because of the protected activity." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (recognizing that "relevant evidence may be used to establish causation"). Plaintiff has adduced no evidence that his African-American supervisor made these alleged statements because of his Administrative Charge. At best, Plaintiff is relying on his own unsupported belief that he was somehow retaliated against.

> Q:    But do you know that that's the reason that your clearance was not reinstated?
> A:    I do not know. I'm making that statement based on the investigator's comments.
> Q:    Right. But you haven't seen the report and cannot speak to why your security clearance was not renewed?
> A:    I do not. I only repeat what the investigator informed me, and I could not, and after that, I could not get a security clearance to work in the companies in which I'd mentioned.

Gordon Dep. 198:13-23. However, Plaintiff "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Plaintiff has failed to adduce sufficient facts to permit the inference that any retaliatory act was taken because of his Charge of Discrimination.

Plaintiff may also establish that "the adverse act bears sufficient temporal proximity to the protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). In this case, at least seventeen months elapsed between the Plaintiff filing his August 30, 2016 Charge and Ms. Singletary allegedly making comments to the investigator in the beginning of 2018. Gordon Dep. 186:21-187:1. Accordingly, temporal proximity alone is not sufficient evidence of causality. *See Shields v. Fed Exp. Corp.*, 120 F. App'x 956, 963 (4th Cir. 2005) (concluding that due to passage of three to four months between plaintiff's protected activity and the adverse employment action, there was insufficient temporal proximity to establish *prima facie* causal link between the two); cf. *King v. Rumsfeld*, 328 F.3d 145, 151 n. 5 (4th Cir. 2003) (ten week gap between protected activity and termination significantly weakened the inference of causation, but did not undercut that inference enough to render plaintiff's *prima facie* case unsuccessful where the termination occurred at a natural decision point). Plaintiff's retaliation claim must be dismissed and summary judgment granted in favor of Engility.

## V.     CONCLUSION

For the reasons stated above, and those that may be stated during oral argument, Defendant Engility Services, LLC, improperly pled as "Engility Corporation In State of Massachusetts", respectfully requests that its Motion for Summary Judgment be granted and that the Complaint be dismissed in its entirety.

30

Dated: August 16, 2021                    Respectfully submitted,

**ENGILITY CORPORATION IN STATE OF MASSACHUSETTS**

By  */s/ Jimmy F. Robinson, Jr.*
Jimmy F. Robinson, Jr., Esquire (VSB #43622)
jimmy.robinson@ogletreedeakins.com
Kyle Elliott, Esquire (VSB #82077)
kyle.elliott@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
901 East Byrd Street, Suite 1300
Riverfront Plaza, West Tower
Richmond, VA  23219
Tel.:    (804) 663-2336;  Fax:  (855) 843-1809

*Counsel for Defendant*

31

## CERTIFICATE OF SERVICE

I certify that on this 16th day of August, 2021, a true and correct copy of Defendant's Motion for Summary Judgment and accompanying Memorandum of Law were electronically filed with the Court's ECF system to be sent via the electronic notification system to the following counsel of record:

Jack Jarrett, Esq. (Va. Bar No. 86176)
Jack.jarrett@leschtlaw.com
Alan Lescht & Associates, P.C.
1825 K Street NW, Suite 750
Washington, D.C. 20006
*Counsel for Plaintiff*

**ENGILITY CORPORATION IN STATE**
**OF MASSACHUSETTS**

By  */s/ Jimmy F. Robinson, Jr.*
Jimmy F. Robinson, Jr., Esquire (VSB #43622)
jimmy.robinson@ogletreedeakins.com
Kyle Elliott, Esquire (VSB #82077)
kyle.elliott@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
901 East Byrd Street, Suite 1300
Riverfront Plaza, West Tower
Richmond, VA  23219
Tel.:    (804) 663-2336;  Fax:  (855) 843-1809

*Counsel for Defendant*

48140252.1

32